# ORIGINAL

1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  TRAVIS E. DOWNS III (148274)
   BENNY C. GOODMAN III (211302)
3  655 West Broadway, Suite 1900
   San Diego, CA  92101-3301
4  Telephone:  619/231-1058
   619/231-7423 (fax)
5  travisd@csgrr.com
   bennyg@csgrr.com
6
   Attorneys for Plaintiff
7

FILED

2009 SEP -3  PM 12: 28

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10  DARREL HERMANS, Derivatively on Behalf  )  No. 09 CV 1927 LAB  CAB
    of SEQUENOM, INC.,                      )
11                                          )  VERIFIED SHAREHOLDER DERIVATIVE
                      Plaintiff,            )  COMPLAINT
12                                          )
          vs.                               )
13                                          )
    ERNST-GUNTER AFTING, JOHN A.            )
14  FAZIO, HARRY F. HIXSON, JR., RICHARD    )
    A. LERNER, RONALD M. LINDSAY,           )
15  KATHLEEN M. WILTSEY, HARRY              )
    STYLLI, PAUL W. HAWRAN, ALLAN T.        )
16  BOMBARD, CHARLES R. CANTOR,             )
    ELIZABETH DRAGON and STEVEN             )
17  OWINGS,                                 )
                                            )
18                    Defendants,           )
                                            )
19        – and –                           )
                                            )
20  SEQUENOM, INC., a Delaware corporation, )
                                            )
21                    Nominal Defendant.    )
                                            )  DEMAND FOR JURY TRIAL
22  _____)

23

24

25

26

27

28

**INTRODUCTION**

1.      This is a shareholder derivative action brought in the right and for the benefit of nominal party Sequenom, Inc. ("Sequenom" or "the Company") against the Company's entire Board of Directors (the "Board") and certain current and/or former top officers, seeking to remedy their breaches of fiduciary duties.

2.      Sequenom is a diagnostic testing and genetics analysis company.  The Company is researching, developing, and pursuing the commercialization of various non-invasive molecular diagnostic tests for prenatal genetic disorders and diseases, oncology, infectious diseases, and other diseases and disorders.

3.      Between June 2008 and the present (the "Relevant Period"), defendants caused Sequenom to issue materially false and misleading statements regarding the Company's Down syndrome test under development.  Specifically, defendants failed to disclose that Sequenom employees mishandled test data and results regarding the Down syndrome test.  As a result of defendants' false and misleading statements, Sequenom stock traded at artificially inflated prices during the Relevant Period, reaching a high of $27.76 per share on September 24, 2008.  This inflated stock price permitted Sequenom to raise $92 million in a secondary stock offering in July 2008, acquire a diagnostic company for fewer shares of Sequenom stock than would have been necessary absent the inflation, and commence a tender offer for another company in an all-stock transaction.

4.      On April 29, 2009, after the market closed, Sequenom issued a press release entitled "SEQUENOM Announces Delay in Launch of SEQureDx Trisomy 21 Test."  The press release stated in part:

> SEQUENOM, Inc. announced today that the expected launch of its SEQureDx™ Down syndrome test is delayed, due to the discovery by company officials of employee mishandling of R&D test data and results.  Accordingly the company is no longer relying on the previously announced R&D test data and results. SEQUENOM has not changed its plans to develop in parallel its RNA- and DNA-based methods for the Down syndrome test and will endeavor to have a validated test in the fourth quarter of 2009.  Under the circumstances, and as supported by key clinical opinion leaders, the company now intends to launch the Down syndrome test upon publication in a peer-reviewed journal of the results from the on-going large, independent clinical studies, which are designed to be practice-changing for Down syndrome testing.

The company's board of directors has formed a special committee of independent directors to oversee an independent investigation of the employees' activity related to the test data and results. The committee has engaged independent counsel to assist the committee in the conduct of the investigation.

\*      \*      \*

Today's announcement regarding the company's SEQureDx Down syndrome R&D test data and results supersedes all previous announcements about such data and test, including its press releases dated June 4, 2008, September 23, 2008, December 1, 2008, January 28, 2009 and February 3, 2009.

5.     On this news, Sequenom's stock collapsed over $11 per share to as low as $3.23 per share, instantly wiping out over $600 million in shareholder equity. Then, on June 30, 2009 the Company announced that it is facing an investigation by the United States Securities and Exchange Commission ("SEC") regarding the Company's April 29, 2009 announcement regarding the SEQureDx Down syndrome test.

6.     Defendants' misconduct has destroyed this once valuable franchise and has subjected the Company to potential liability for violation of state and federal laws.

**JURISDICTION AND VENUE**

7.     This Court has jurisdiction under 28 U.S.C. §1332(a)(2). This is because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

8.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

9.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (i) Sequenom maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Sequenom, occurred in this District; and (iv) defendants have received substantial compensation in

1   this District by doing business here and engaging in numerous activities that had an effect in this

2   District.

3   **PARTIES**

4       10.    Plaintiff Darrel Hermans has been a shareholder of Sequenom since October 2008.

5   Plaintiff is a citizen of Wisconsin.

6       11.    Nominal party Sequenom is a diagnostic testing and genetics analysis company. The

7   Company is focused on providing products, services, diagnostic testing, applications, and genetic

8   analysis products that translate the results of genomic science into solutions for biomedical research,

9   translational research, molecular medicine applications, and agricultural, livestock and other areas of

10  research. Sequenom is researching, developing, and pursuing the commercialization of various non-

11  invasive molecular diagnostic tests for prenatal genetic disorders and diseases, oncology, infectious

12  diseases, and other diseases and disorders. Sequenom is a Delaware corporation headquartered in

13  San Diego, California.

14      12.    Defendant Ernst-Gunter Afting, Ph.D., M.D. ("Afting") has been a director of

15  Sequenom since 1996. Afting is also a member of Sequenom's Audit Committee and has been since

16  at least 2007. Because of Afting's positions, he knew, consciously disregarded, was reckless and

17  grossly negligent in not knowing or should have known the adverse, non-public information about

18  the business of Sequenom, including its finances, markets, and present and future business prospects,

19  via access to internal corporate documents, conversations and connections with other corporate

20  officers and employees, attendance at Board meetings and committees thereof, as well as reports and

21  other information provided to him in connection therewith. During the Relevant Period, Afting

22  participated in the issuance of improper statements, including the preparation of the improper press

23  releases and SEC filings and approval of other statements made to the press, securities analysts and

24  Sequenom shareholders. Defendant Afting is a citizen of Germany.

25      13.    Defendant John A. Fazio ("Fazio") has been a director of Sequenom since 2007.

26  Fazio is also Chairman of Sequenom's Audit Committee and has been since October 2007. Because

27  of Fazio's positions, he knew, consciously disregarded, was reckless and grossly negligent in not

28  knowing or should have known the adverse, non-public information about the business of

Sequenom, including its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Fazio participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Sequenom shareholders. Defendant Fazio is a citizen of Florida.

14.    Defendant Harry F. Hixson, Jr., Ph.D. ("Hixson") has been Chairman of Sequenom's Board since 2003. Hixson is also a member of Sequenom's Audit Committee and has been since February 2009 and a member of Sequenom's Compensation Committee and has been since at least 2007. Hixson was previously Chairman of the Audit Committee from February 2007 to October 2007. Because of Hixson's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Sequenom, including its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Hixson participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Sequenom shareholders. Defendant Hixson is a citizen of California.

15.    Defendant Richard A. Lerner, M.D. ("Lerner") has been a director of Sequenom since 2007. Lerner is also a member of Sequenom's Compensation Committee and has been since February 2008. Because of Lerner's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Sequenom, including its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Lerner

1  participated in the issuance of improper statements, including the preparation of the improper press

2  releases and SEC filings and approval of other statements made to the press, securities analysts and

3  Sequenom shareholders.   Defendant Lerner is a citizen of California.

4        16.    Defendant Ronald M. Lindsay, Ph.D. ("Lindsay") has been a director of Sequenom

5  since 2003.  Lindsay is also Chairman of Sequenom's Compensation Committee and has been since

6  at least 2007.   Lindsay was a member of Sequenom's Audit Committee during at least 2007.

7  Because of Lindsay's positions, he knew, consciously disregarded, was reckless and grossly

8  negligent in not knowing or should have known the adverse, non-public information about the

9  business of Sequenom, including its finances, markets, and present and future business prospects, via

10  access to internal corporate documents, conversations and connections with other corporate officers

11  and employees, attendance at Board meetings and committees thereof, as well as reports and other

12  information provided to him in connection therewith.   During the Relevant Period, Lindsay

13  participated in the issuance of improper statements, including the preparation of the improper press

14  releases and SEC filings and approval of other statements made to the press, securities analysts and

15  Sequenom shareholders.  Defendant Lindsay is a citizen of Massachusetts.

16        17.    Defendant Kathleen M. Wiltsey ("Wiltsey") has been a director of Sequenom since

17  2007.  Wiltsey is also a member of Sequenom's Audit Committee and has been since February 2008.

18  Because of Wiltsey's positions, she knew, consciously disregarded, was reckless and grossly

19  negligent in not knowing or should have known the adverse, non-public information about the

20  business of Sequenom, including its finances, markets, and present and future business prospects, via

21  access to internal corporate documents, conversations and connections with other corporate officers

22  and employees, attendance at Board meetings and committees thereof, as well as reports and other

23  information provided to her in connection therewith.   During the Relevant Period, Wiltsey

24  participated in the issuance of improper statements, including the preparation of the improper press

25  releases and SEC filings and approval of other statements made to the press, securities analysts and

26  Sequenom shareholders.  Defendant Wiltsey is a citizen of California.

27        18.    Defendant Harry Stylli, Ph.D. ("Stylli") is, and at all relevant times was, President

28  and Chief Executive Officer ("CEO") of Sequenom.  Stylli has been a director of Sequenom since

1    2005. Because of Stylli's positions, he knew, consciously disregarded, was reckless and grossly

2    negligent in not knowing or should have known the adverse, non-public information about the

3    business of Sequenom, including its finances, markets, and present and future business prospects, via

4    access to internal corporate documents, conversations and connections with other corporate officers

5    and employees, attendance at management and Board meetings and committees thereof, as well as

6    reports and other information provided to him in connection therewith. During the Relevant Period,

7    Stylli participated in the issuance of improper statements, including the preparation of the improper

8    press releases and SEC filings and approval of other statements made to the press, securities analysts

9    and Sequenom shareholders. Defendant Stylli received the following compensation:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2008 | $441,000 | $1,111,100 | $1,576,999 | $181,912 | $631,849 | $16,226 |
| 2007 | $430,500 | $552,000 | $914,994 | $176,400 | – | $15,967 |

14    Defendant Stylli is a citizen of California.

15       19.     Defendant Paul W. Hawran ("Hawran") is, and at all relevant times was, Chief

16    Financial Officer ("CFO") of Sequenom. Hawran was a Sequenom director from August 2006 until

17    February 2007. Hawran was also Chairman of Sequenom's Audit Committee from August 2006 to

18    February 2007. Because of Hawran's positions, he knew, consciously disregarded, was reckless and

19    grossly negligent in not knowing or should have known the adverse, non-public information about

20    the business of Sequenom, including its finances, markets, and present and future business prospects,

21    via access to internal corporate documents, conversations and connections with other corporate

22    officers and employees, attendance at management and Board meetings and committees thereof, as

23    well as reports and other information provided to him in connection therewith. During the Relevant

24    Period, Hawran participated in the issuance of improper statements, including the preparation of the

25    improper press releases and SEC filings and approval of other statements made to the press,

26    securities analysts and Sequenom shareholders. Defendant Hawran received the following

27    compensation:

28

| Fiscal Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|
| 2008 | $308,474 | $260,631 | $79,529 | $31,057 | $19,442 |
| 2007 | $225,000 | $174,340 | $54,247 | – | $46,888 |

Defendant Hawran is a citizen of California.

20.     Defendant Allan T. Bombard, M.D. ("Bombard") is, and at all relevant times was, Chief Medical Officer of Sequenom. Prior to being named Chief Medical Officer, Bombard served as Chairman of Sequenom's Clinical Advisory Board and was the principal investigator in a screening study to clinically assess the Company's noninvasive prenatal Down syndrome diagnostic technology. Because of Bombard's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Sequenom, including its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Bombard participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Sequenom shareholders. Defendant Bombard is a citizen of California.

21.     Defendant Charles R. Cantor, Ph.D. ("Cantor") is the Chief Scientific Officer of Sequenom and has been a director since 2000. Because of Cantor's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Sequenom, including its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Cantor participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of

- 7 -

1   other statements made to the press, securities analysts and Sequenom shareholders.  Defendant

2   Cantor received the following compensation:

| Fiscal Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|
| 2008 | $319,020 | $180,656 | $82,247 | $35,717 | $5,399 |
| 2007 | $308,160 | $84,547 | $62,400 | – | $6,858 |

7   Defendant Cantor is a citizen of California.

8       22.    Defendant Elizabeth Dragon, Ph.D. ("Dragon") is, and at all relevant times was,

9   Senior Vice President, Research and Development of Sequenom.  Because of Dragon's position, she

10  knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have

11  known the adverse, non-public information about the business of Sequenom, including its finances,

12  markets, and present and future business prospects, via access to internal corporate documents,

13  conversations and connections with other corporate officers and employees, attendance at

14  management meetings, as well as reports and other information provided to her in connection

15  therewith.  During the Relevant Period, Dragon participated in the issuance of improper statements,

16  including the preparation of the improper press releases and SEC filings and approval of other

17  statements made to the press, securities analysts and Sequenom shareholders.  Defendant Dragon

18  received the following compensation:

| Fiscal Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|
| 2008 | $279,133 | $167,906 | $71,964 | $2,478 |
| 2007 | $270,967 | $75,917 | $44,001 | $1,904 |

Defendant Dragon is a citizen of California.

23      23.    Defendant Steven Owings ("Owings") is, since January 2007, Vice President,

24  Commercial Development and Prenatal Diagnostics of Sequenom.  During the Relevant Period,

25  while Sequenom's stock price was inflated due to defendants' false statements and while in

26  possession of material non-public information regarding Sequenom's unreliable SEQureDx

27  diagnostic test results, Owings sold 22,598 shares of his Sequenom stock for proceeds of $366,000.

28

1  Because of Owings' position, he knew, consciously disregarded, was reckless and grossly negligent

2  in not knowing or should have known the adverse, non-public information about the business of

3  Sequenom, including its finances, markets, and present and future business prospects, via access to

4  internal corporate documents, conversations and connections with other corporate officers and

5  employees, attendance at management meetings, as well as reports and other information provided to

6  him in connection therewith.  During the Relevant Period, Owings participated in the issuance of

7  improper statements, including the preparation of the improper press releases and SEC filings and

8  approval of other statements made to the press, securities analysts and Sequenom shareholders.

9  Defendant Owings received the following compensation:

| Fiscal Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|
| 2007 | $213,173 | $104,679 | $33,830 | $89,789 |

13  Defendant Owings is a citizen of California.

14      24.     Defendants Stylli, Hawran, Bombard, Cantor, Dragon, Owings, Afting, Fazio,

15  Hixson, Lerner, Lindsay and Wiltsey (the "Individual Defendants"), because of their positions with

16  the Company, possessed the power and authority to control the contents of Sequenom's quarterly

17  reports, press releases, and presentations to securities analysts, money and portfolio managers, and

18  institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports

19  and press releases alleged herein to be misleading prior to or shortly after their issuance and had the

20  ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their

21  positions with the Company, and their access to material non-public information available to them

22  but not to the public, the Individual Defendants knew that the adverse facts specified herein had not

23  been disclosed to and were being concealed from the public and that the positive representations

24  being made were then materially false and misleading.  The Individual Defendants are liable for the

25  false statements pleaded herein.

26                    **DEFENDANTS' FIDUCIARY DUTIES**

27      25.     Each officer and director of Sequenom owed Sequenom or its shareholders the duty to

28  exercise a high degree of loyalty and diligence in the management and administration of the affairs

1   of the Company, as well as in the use and preservation of its property and assets.  The conduct of

2   Sequenom's directors and officers complained of herein involves a violation of their obligations as

3   directors of Sequenom and the absence of good faith on their part for their duties to the Company

4   and its shareholders.  The misconduct of Sequenom's officers has been ratified by Sequenom's

5   Board, which has failed to take any legal action on behalf of the Company against them.

6          26.    By reason of their positions as officers, directors and/or fiduciaries of Sequenom and

7   because of their ability to control the business and corporate affairs of Sequenom, the Individual

8   Defendants owed Sequenom and its shareholders fiduciary obligations of due care, candor, trust and

9   loyalty, and were required to use their ability to control and manage the Company in a fair, just,

10  honest and equitable manner, and to act in furtherance of the best interests of Sequenom and its

11  shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests

12  or benefit.  In addition, as officers and/or directors of a publicly held company, the Individual

13  Defendants had a duty to promptly disseminate accurate and truthful information with respect to the

14  Company's operations, projections and forecasts, so as to (i) fulfill their duty of candor and honesty

15  to Sequenom's existing shareholders and (ii) so that the market price of Sequenom's stock would be

16  based on truthful and accurate information.

17         27.    The Individual Defendants, because of their positions of control and authority as

18  directors and/or officers of Sequenom, were able to and did, directly and indirectly, control the

19  wrongful acts complained of herein.  Because of their executive and directorial positions with

20  Sequenom, each of the Individual Defendants had access to adverse non-public information about

21  the financial condition, operations, and future business prospects of Sequenom and was required to

22  disclose it promptly and accurately to the Company's shareholders and the financial markets but did

23  not do so.

24         28.    To discharge their duties, the officers and directors of Sequenom were required to

25  exercise reasonable and good faith supervision over the management, policies, practices, and

26  controls of the business and financial affairs of Sequenom.  By virtue of such duties, the officers and

27  directors of Sequenom were required, among other things, to:

28

- 10 -

1        (a)     Manage, conduct, supervise, and direct the business affairs of Sequenom in

2 accordance with law (including U.S. securities laws and the Sarbanes-Oxley Act of 2002),

3 government rules and regulations and Sequenom's charter and bylaws;

4        (b)     Neither violate nor knowingly permit any officer, director, or employee of

5 Sequenom to violate applicable laws, rules and regulations;

6        (c)     Remain informed as to the status of Sequenom's operations, and upon receipt

7 of notice or information of imprudent or unsound practices, to make a reasonable inquiry in

8 connection therewith, and to take steps to correct such conditions or practices and make such

9 disclosures as are necessary to comply with their duty of candor to the Company's shareholders;

10        (d)     Establish and maintain systematic and accurate records and reports of the

11 business and affairs of Sequenom and procedures for the reporting of the business and affairs to the

12 Board and to periodically investigate, or cause independent investigation to be made of, said reports

13 and records;

14        (e)     Maintain and implement an adequate, functioning system of internal legal,

15 financial and accounting controls, such that Sequenom's financial statements would be accurate and

16 the actions of its directors would be in accordance with all applicable laws;

17        (f)     Exercise reasonable control and supervision over public statements to the

18 securities markets and trading in Sequenom stock by the officers and employees of Sequenom; and

19        (g)     Supervise the preparation and filing of any financial reports or other

20 information required by law from Sequenom and to examine and evaluate any reports of

21 examinations, audits, or other financial information concerning the financial affairs of Sequenom

22 and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the

23 subjects and duties set forth above.

24     29.     During all times relevant hereto, each of the Individual Defendants occupied a

25 position with Sequenom or was associated with the Company in such a manner as to make them

26 privy to confidential and proprietary information concerning Sequenom and its operations, finances

27 and financial condition. Because of these positions and such access, each of the Individual

28 Defendants knew that the true facts specified herein regarding Sequenom's business and finances

1  had not been disclosed to and were being concealed from its shareholders and the public. The

2  Individual Defendants, as corporate fiduciaries entrusted with non-public information, were

3  obligated to disclose material adverse information regarding Sequenom and to take any and all

4  action necessary to ensure that the officers and directors of Sequenom did not act upon such

5  privileged non-public information in a manner which caused the Company to violate the law.

6       30.    The Individual Defendants breached their duties of loyalty and good faith by allowing

7  or by themselves causing the Company to misrepresent its financial results and prospects, as detailed

8  herein, and by failing to prevent the Individual Defendants from taking such illegal actions. Each of

9  the Individual Defendants participated in the issuance and/or review of false and/or misleading

10  statements, including the preparation of false and/or misleading press releases, SEC filings and

11  reports to Sequenom shareholders. In addition, as a result of defendants' illegal actions and course

12  of conduct during the Relevant Period, the Company is now the subject of several class action

13  lawsuits that allege violations of the federal securities laws. As a result, Sequenom has expended and

14  will continue to expend significant sums of money. Moreover, these actions have irreparably

15  damaged Sequenom's corporate image and goodwill.

16            **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

17       31.    In committing the wrongful acts alleged herein, the Individual Defendants have

18  pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and

19  conspired with one another in furtherance of their common plan or design. In addition to the

20  wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further

21  aided and abetted and/or assisted each other in breaching their respective duties.

22       32.    During all times relevant hereto, the Individual Defendants collectively and

23  individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the

24  Company was improperly misrepresenting its SEQureDx validation study results; (ii) enhance the

25  Individual Defendants' executive and directorial positions at Sequenom and the profits, power and

26  prestige that the Individual Defendants enjoyed as a result of holding these positions; and (iii)

27  deceive the investing public, including shareholders of Sequenom, regarding the Individual

28  Defendants' management of Sequenom's operations, the Company's financial health and stability,

- 12 -

1   and its future business prospects that had been misrepresented by defendants throughout the

2   Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual

3   Defendants collectively and individually took the actions set forth herein.

4        33.    The Individual Defendants engaged in a conspiracy, common enterprise and/or

5   common course of conduct during the Relevant Period.  During this time, the Individual Defendants

6   caused the Company to conceal the true fact that Sequenom was misrepresenting its business

7   prospects.

8        34.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or

9   common course of conduct by causing the Company to purposefully, recklessly or negligently

10   release improper statements.  Because the actions described herein occurred under the authority of

11   the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in

12   the conspiracy, common enterprise and/or common course of conduct complained of herein.

13        35.    Each of the Individual Defendants aided and abetted and rendered substantial

14   assistance in the wrongs complained of herein.  In taking such actions to substantially assist the

15   commission of the wrongdoing complained of herein, each Individual Defendant acted with

16   knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

17   wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

18                              **SUBSTANTIVE ALLEGATIONS**

19        36.    Sequenom is a diagnostic testing and genetics analysis company.  The Company is

20   focused on providing products, services, diagnostic testing, applications, and genetic analysis

21   products that translate the results of genomic science into solutions for biomedical research,

22   translational research, molecular medicine applications, and agricultural, livestock and other areas of

23   research.  Its development and commercialization efforts in various diagnostic areas include non-

24   invasive prenatal diagnostics, oncology, infectious diseases and other disorders.  The Company is

25   researching, developing, and pursuing the commercialization of various non-invasive molecular

26   diagnostic tests for prenatal genetic disorders and diseases, oncology, infectious diseases, and other

27   diseases and disorders.

28

37.     The Company was focusing on non-invasive Down syndrome screening technology as the Relevant Period began in what the Company termed a "$2 billion" opportunity. This was electrifying for a company whose annual revenues were less than $50 million.

38.     On June 4, 2008, Sequenom issued a press release entitled "Sequenom Announces Results of Screening Studies for Down Syndrome and Updates Development of Noninvasive Prenatal Diagnostics at Analyst and Investor Briefing," which stated in part:

> Sequenom, Inc., a leading provider of genetic-analysis solutions, announced positive results from screening studies using the Company's noninvasive circulating cell-free fetal (ccff) nucleic acid SEQureDx™ Technology, which enables the detection of fetal aneuploidy, including Down syndrome from maternal blood. At its analyst-and-investor briefing "The Future of Noninvasive Prenatal Diagnostics" held at the International Society of Prenatal Diagnostics (ISPD) conference in Vancouver, Canada, executives were joined by a panel of leading scientists and clinicians to discuss study results and updates in the development of noninvasive prenatal diagnostics.
>
> The Company reported that in blinded studies performed at Sequenom involving approximately 200 clinical samples collected both prospectively and retrospectively, its proprietary test for Down syndrome correctly identified 100% of all Down syndrome samples (i.e. sensitivity or detection rate), without any false-positive outcomes (i.e. specificity). Population coverage for the T21 test improved to at least 93% of the U.S. population. With currently available serum-testing options having detection rates between 70% to 90% and false-positive rates as high as 5%, SEQureDx Technology shows promise for significant performance advantages over the current paradigms for prenatal screening. The Company expects to continue its development activities through the end of 2008, at which time the Company will initiate transfer of the technology to laboratory partners. The Company plans to initiate a multi-site validation study consisting of several thousand samples in the fourth quarter this year and launch its Down syndrome test as a Laboratory Developed Test (LDT) in the U.S. in the first half 2009.
>
> "We are very pleased to be reporting substantial progress toward commercializing an important test to screen for Down syndrome that can be administered as early as late in the first trimester through a simple blood draw from the mother," said Harry Stylli, Ph.D., Sequenom's President and Chief Executive Officer. "Data from our blinded screening study for the detection of fetal aneuploidy indicate that the current version of our test has identified all Down syndrome samples without any false-positive outcomes. Also our coverage has improved to at least 93% of the U.S. population. Although these results require further validation in larger studies, such results using SEQureDxTM Technology can potentially transform current clinical practice for Down syndrome-risk assessment."
>
> The studies conducted both prospectively and retrospectively, involved approximately 200 samples in both normal and high-risk patients. The blinded-prospective study involved 180 samples comprising 130 low-risk and 50 high-risk samples. The test correctly identified three Down syndrome samples without any false-positive outcomes. Of the 21 blinded samples analyzed retrospectively, the test correctly identified seven Down syndrome samples while also indicating no false-positive results.

"A direct, noninvasive genetic assessment of fetal Down syndrome will result in far-better screening accuracy and would dramatically reduce the number of unnecessary, invasive diagnostic procedures that women undergo in current maternal serum-screening protocols. Improved detection rates, as reported by Sequenom in its assay optimization studies, exceed those with currently available screening models," said Allan T. Bombard, M.D., a reproductive geneticist with more than two decades of experience in the field of prenatal screening and diagnosis. (Dr. Bombard serves as a Chief Medical Director at Sharp Mary Birch Hospital and is the Principal Investigator of the study.) "Moreover, having minimum false-positive results will significantly reduce the number of unnecessary confirmatory diagnostic tests, as well as the anxiety and complications associated with invasive procedures."

Currently available tests conducted during the first or second trimester of pregnancy use epigenetic markers associated with the Down syndrome phenotype that are characterized as "surrogate" markers as they are not directly related to the extra Number 21 chromosome. Different combinations of markers, measured at different times in pregnancy, constitute the multiple-marker approach to screening. These tests have detection rates of 70% to 90% with approximately a 5% false-positive rate, while also having inconsistent population coverage or ethnicity rates. The SEQureDx test uses a maternal blood sample drawn as early as the first trimester and identifies directly the extra Number 21 chromosome. Invasive procedures such as amniocentesis or chorionic villus sampling (CVS) carry risk of miscarriage and other risks to mother and fetus.

"Current screening methods, using multiple 'surrogate' markers, are very good, but are unlikely to reach diagnostic potential," said Jacob Canick, Ph.D., Professor of Pathology and Laboratory Medicine at Brown University Medical School. "In contrast, I am optimistic that tests using multiple-fetal RNA and DNA markers can be developed not only for Down syndrome, but for all clinically important aneuploidies, and it is reasonable to expect that such direct, noninvasive diagnostics could be done in the first trimester of pregnancy."

39.     On July 1, 2008, pursuant to a prospectus and registration statement which were false in that the documents concealed Sequenom's inability to adequately control its employees' handling of test data, Sequenom completed an underwritten public offering of its common stock totaling 5.5 million shares of common stock at $15.50 per share, with the underwriters exercising their option to purchase an additional 825,000 shares on July 8, 2008. Including the additional shares, the offering resulted in net proceeds of $92 million to Sequenom. Defendants Stylli, Hawran, Cantor, Hixson, Afting, Fazio, Lerner, Lindsay and Wiltsey signed the registration statement. Cooley Godward Kronish LLP was retained as counsel to opine on the "validity of the securities."

40.     On July 30, 2008, Sequenom reported is second quarter 2008 financial results, in a release which stated in part:

"We have taken major steps toward the introduction of our noninvasive prenatal test for Down syndrome, based on our SEQureDx™ technology," commented Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom.

"On June 3 at the International Society of Prenatal Diagnostics conference in Vancouver, we announced study results involving 200 normal and high-risk samples. The results showed that we correctly identified all Down samples, with no false-positives. This compares to current screening tests that have detection rates of 70% to 90% with approximately 5% false-positives. We are currently focused on analyzing first trimester samples to validate the applicability of our Down syndrome test for first trimester screening."

\*    \*    \*

2008 Second Quarter and Recent Highlights

– Down Syndrome Screening Study Results: In early June, we announced positive results from screening studies using our noninvasive circulating cell-free fetal (ccff) nucleic acid SEQureDx technology, which enables the detection of fetal aneuploidy, including Down syndrome from maternal blood. We reported that in blinded studies performed at Sequenom involving approximately 200 clinical samples collected both prospectively and retrospectively, our proprietary test for Down syndrome correctly identified all Down syndrome samples, without any false-positive outcomes. Currently available serum-testing options having detection rates between 70% to 90%, and false-positive rates as high as 5%.

41.    On September 23, 2008, Sequenom issued a press release entitled "Sequenom Announces Additional, Positive Results for Down Syndrome Test at Analyst Briefing," which stated in part:

Sequenom, Inc., a leading provider of genetic-analysis and molecular diagnostic solutions, announced additional, positive results from screening studies using the Company's noninvasive circulating cell-free fetal (ccff) nucleic acid SEQureDx™ Technology, which enables the detection of fetal aneuploidy, including Down syndrome from maternal blood, at its Analyst Briefing in New York City. Among the data presented, Sequenom's test demonstrated complete concordance with clinical results (no false positives and no false negatives) in both first and second trimester samples (over 200 samples announced today and in excess of 400 prospective samples to-date). Sequenom executives were joined by a panel of leading scientists and clinicians to discuss these study results and updates in the development of noninvasive prenatal diagnostics.

"These data expand upon the data we announced in June and underscore the potential for our SEQureDx Technology to transform current clinical practice for prenatal diagnostics as a primary screening tool for Trisomy 21. Furthermore, these results support the potential for our test to be used in the first trimester," said Harry Stylli, Ph.D., Sequenom's President and Chief Executive Officer. "In addition, our announcement earlier today regarding our acquisition of the Center for Molecular Medicine, a CLIA-certified molecular diagnostics laboratory, and our partnership with Spectrum Health and the Van Andel Research Institute, provides us with important infrastructure and commercialization control. We are delighted with our progress in bringing to market an important, noninvasive screening test for Down syndrome, as well as a broader menu of molecular diagnostic tests. These results are very promising, and we look forward to continuing the clinical development and validation progress to launch in the first half of 2009."

Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development at Sequenom, presented data from blinded studies performed at Sequenom involving 219 new clinical samples collected prospectively, showing that its proprietary test for Down syndrome correctly identified 100% of all Down syndrome samples (i.e. sensitivity or detection rate), without any false-positive outcomes (i.e. specificity). The SEQureDx prototype test also demonstrated its ability to correctly identify a Down syndrome positive sample in the first trimester, confirmed by chorionic villus sampling (CVS), a current testing standard that requires the harvesting of placental tissue cells.

Sequenom indicated that with the addition of new SNPs in PLAC4 and a recently discovered gene, the SEQureDx Trisomy 21 test should increase its coverage from 93% to greater than 95% in the US population. The Company has also identified novel marker for Trisomy 18 that have passed its initial selection criteria, and other chromosomes, and intends to develop these markers into new tests.

The Company expects to continue its current development activities through the end of 2008, at which time the Company will initiate a multi-site 3,000 to 5,000-sample laboratory developed test (LDT) validation study, which is expected to be completed and submitted for publication at the time of the anticipated commercial launch in June 2009. To facilitate the LDT validation study, Sequenom also indicated that the company will be collaborating with new clinical partners who perform in excess of 12,000 amniocenteses and 3,000 CVS per year. In addition, Sequenom announced sponsorship of the RNA Noninvasive Aneuploidies ("RNA") study, a landmark, multi-center, prospective study involving up to 10,000 samples from first and second trimester pregnancies using the SEQureDx technology, managed and analyzed by an independent third-party.

42.     Additionally on September 23, 2008, Sequenom issued a press release entitled "Sequenom Announces Acquisition of CLIA-Certified Laboratory and Partnerships with Spectrum Health and Van Andel Research Institute – Acquisition of Center for Molecular Medicine Positions Sequenom for Commercial Launch of SEQureDx™ Test in First Half 2009," which stated in part:

Sequenom today announced that it entered into an agreement to acquire the Center for Molecular Medicine (CMM), a Clinical Laboratory Improvement Act (CLIA) certified clinical diagnostics laboratory based in Grand Rapids, Michigan. CMM is an innovative joint venture between Spectrum Health, one of the largest not-for-profit health systems in Michigan, and the Van Andel Research Institute, an independent research institute with significant molecular biology expertise. Under the terms of the agreement, Sequenom will pay a purchase price of approximately $4.0 million (less CMM's cash at closing) to acquire CMM and will enter into collaborative agreements with Spectrum Health and the Van Andel Research Institute. Ninety percent of the purchase price will be paid in shares of Sequenom common stock. Sequenom also received a tax incentive package valued at up to $20 million over 12 years. The project includes a potential, near-term capital investment of approximately $10 million and the potential creation of several hundred jobs over five years.

*     *     *

Acquisition of the CLIA-certified lab will allow Sequenom control over all aspects of the commercialization of its SEQureDx technology, including marketing

- 17 -

and communication programs, and critical sales and third-party payer reimbursement contracting strategies.

43.    On October 30, 2008, Sequenom issued a press release entitled "Sequenom Reports 2008 Third Quarter Financial Results – Company Achieved Significant Milestones in Development of Proprietary Down Syndrome Test; Company Affirms 2008 Revenue Guidance," which stated in part:

> "During the third quarter we rapidly advanced our paradigm-shifting approach to Down syndrome screening and reinforced our significant leadership in the noninvasive prenatal diagnostics space," stated Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "Specifically, we announced complete clinical concordance with the results from our Trisomy 21 technology in more than 400 maternal blood samples analyzed to date. In addition, we secured additional intellectual property to further enhance our already significant proprietary position in noninvasive prenatal diagnostics, and we signed a definitive agreement to acquire the Center for Molecular Medicine (CMM), a state-of-the-art CLIA-certified laboratory. Upon completion of the CMM acquisition, CMM will be positioned to launch RHD and Fetal (XY) tests in the first quarter of 2009, followed by the Trisomy 21 test by mid-year. We look forward to continuing this progress in the quarter and year ahead."

> *      *      *

> 2008 Third Quarter and Recent Highlights

> –      Further Positive Results from Down Syndrome Screening Study: In late September Sequenom announced additional positive results from screening studies for detection of fetal aneuploidy, including Down syndrome, from maternal blood using Sequenom's noninvasive circulating cell-free fetal (ccff) nucleic acid SEQureDx Technology. At the Analyst and Investor Briefing, Sequenom presented data demonstrating complete concordance with clinical results (no false positives and no false negatives) in both first and second trimester samples from an additional 200 (400 in total) prospective samples.

44.    On December 1, 2008, Sequenom issued a press release entitled "Next-Generation Noninvasive Diagnostic Technology Shown to Accurately Detect Fetal Down Syndrome in First Trimester of Pregnancy," which stated in part:

> Sequenom, Inc. announced new data from a collaborative project with The Chinese University of Hong Kong, published this week in the Early Edition of the Proceedings of the National Academy of Sciences, that demonstrate its innovative, next-generation, noninvasive prenatal diagnostic technology accurately quantified maternal plasma DNA sequences for fetal Trisomy 21, or Down syndrome, based on samples taken from women in the first and second trimesters of pregnancy. These data are the first to suggest that this future approach, based on massively parallel genomic DNA sequencing, can be effective in women who had not previously undergone invasive procedures.

- 18 -

This study used massively parallel genomic sequencing to quantify maternal plasma DNA sequences for the noninvasive prenatal detection of Down syndrome, assessing samples from 28 women in the first and second trimesters of pregnancy. All 14 Down syndrome fetuses and normal fetuses were correctly identified at these early stages.

"Current invasive methods for diagnosing Down syndrome in pregnancy have documented risks associated with such procedures. Our new study using massively parallel genomic DNA sequencing represents a 'next-generation' technology for noninvasive, safe testing of Down syndrome. This is the first study to show that this approach can be used for the detection of Down syndrome in both the first and second trimesters, based on a rigorously controlled clinical cohort in which the pregnant women with fetuses affected by Trisomy 21 and those with normal fetuses were matched in gestational age, and in which most of the studied subjects had not previously undergone an invasive procedure. The latter point is important as it shows that the method would truly work in the noninvasive prenatal diagnostic scenario. This study also employs a novel data analysis algorithm which has achieved an unprecedented clear separation of the Trisomy and normal samples," stated Dennis Lo, M.D., Ph.D., co-author of the study, and Li Ka Shing, Professor of Medicine at The Chinese University of Hong Kong. "While this new approach is several years away as a commercially viable test, we believe that massively parallel genomic sequencing of DNA in maternal plasma may offer a complementary approach to the RNA SNP allelic ratio approach that we reported last year for Trisomy 21 detection. The two approaches have performance and cost profiles which would potentially be synergistic to one another."

Sequenom licensed the exclusive rights to the massively parallel genomic DNA sequencing technology featured in this study from The Chinese University of Hong Kong in September 2008.

"Screening tests currently available for early detection of Down syndrome and other chromosomal disorders are associated with a relatively high rate of inaccuracy, which can result in an overlooked abnormality or, in the case of false positive results, unnecessary invasive and risky procedures," stated Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "Systems to support DNA sequencing like massively parallel genomic sequencing or shotgun sequencing are currently limited to the academic setting due to scalability limitations and high cost, therefore practical applications are several years from commercialization. We find the data reported by Dr. Lo and associates to be very compelling and, while we continue to evaluate other promising approaches, Sequenom licensed this technology several months ago because we believe massively parallel genomic sequencing is a promising approach to prenatal diagnostics that may offer a future extension to our SEQureDx™ prenatal diagnostics franchise. Even though this technology is years away from the clinic, we expect that our current RNA SNP allelic ratio technology – which is the basis for the Down syndrome test we expect to launch in June 2009 – will represent a major step forward in maternal and fetal testing."

Current screening technology for Down syndrome includes serum marker analysis, such as the quad screen and first trimester combined screening that employs both serum marker testing and nuchal translucency. These approaches have detection or sensitivity rates of 80% and 85% respectively, which means between 15% and 20% of all Down syndrome-affected pregnancies will not be identified as needing further evaluation. In addition, these approaches also have false positive rates between 5% and 10%, resulting in hundreds of thousands of unnecessary, highly invasive CVS or amniocentesis procedures. These invasive procedures, which

- 19 -

1    are used to determine whether the fetus has Down syndrome, carry a risk of
     miscarriage in the range of one-in-100 to one-in-300.

2

3         The study, entitled "Noninvasive prenatal diagnosis of fetal chromosomal
     aneuploidy by massively parallel genomic sequencing of DNA in maternal plasma"
     by Chiu et. al., is available online in this week's Early Edition of PNAS at

4    www.PNAS.org.

5    45.    On January 14, 2009, Sequenom announced that it intended to make an exchange

6    offer to acquire all of the outstanding shares of common stock of EXACT Sciences Corporation in

7    an all-stock transaction valued at approximately $41 million. Under the terms of the proposal, each

8    share of EXACT Sciences Corporation would be exchanged for $1.50 in Sequenom common stock.

9    This consideration would be subject to a floating exchange rate within a 15% collar, in which the

10   price of Sequenom common stock is between $20.74 and $28.06 per share.

11   46.    On January 28, 2009, Sequenom issued a press release entitled "Sequenom Center for

12   Molecular Medicine Collaborates with Obstetrix Medical Group to Provide Clinical Samples for

13   LDT Validation Study – Collaboration with Leading Maternal-Fetal Medicine Physician Group

14   Signifies Further Step Toward Commercializing Trisomy 21 Test," which stated in part:

15        Sequenom, Inc., today announced a collaboration with Obstetrix Medical Group, to
          provide the Sequenom Center for Molecular Medicine (SCMM) with samples for a
16        study to further evaluate its novel, noninvasive prenatal test to assess Down
          syndrome (Trisomy 21) based on its circulating cell-free fetal (ccff) nucleic acid
17        SEQureDx™ technology.  Obstetrix is a national physician group practice of
          maternal-fetal medicine specialists that is affiliated with Pediatrix Medical Group.

18

19        This prospective multi-center feasibility study, "Noninvasive Screening for
          Fetal Aneuploidy: A New Maternal Plasma Marker," is designed as a Laboratory
20        Developed Test (LDT) validation study and will evaluate up to 5,000 samples.  To
          facilitate the LDT validation of the SEQureDx Trisomy 21 Test, Sequenom will be
21        collaborating with physicians practicing as part of Obstetrix as well as other
          maternal-fetal medicine practices. According to the study protocol, Obstetrix will
22        collect clinical maternal plasma samples prior to performing an amniocentesis or
          chorionic villus sampling (CVS) procedure. SCMM will then compare results for the
23        detection of Down syndrome using its prototype test of maternal blood samples to
          the related amniocentesis or CVS results.

24        "We are delighted to be working with Obstetrix, a highly respected leader in
          the care of women during high-risk pregnancies," said Harry Stylli, Ph.D.,
25        Sequenom's President and Chief Executive Officer.  "This validation study is an
          important next step in our commercialization strategy to bring our noninvasive
26        Trisomy 21 Down syndrome maternal blood LDT to market."

27        Thomas J. Garite, M.D., of Obstetrix Medical Group, who will oversee the
          study, stated, "The discovery of fetal DNA and RNA in the plasma of pregnant
28        women has led to promising approaches to noninvasive prenatal testing for the

identification of pregnancies with a chromosomal abnormality such as Down syndrome. This test could produce results that are more accurate than current early-stage serum screening methods, thus reducing the need for invasive tests, such as amniocentesis or CVS, which pose a certain level of risk for mother and fetus."

Dr. Stylli added, "We are committed to becoming a leader in noninvasive prenatal diagnostics. As such, Sequenom has taken a three-pronged approach to the development and clinical evaluation of the Trisomy 21 technology. First, we completed a rigorous R&D study over the last year, the final data from which will be announced later today. Second, we initiated this LDT validation study to obtain extensive clinical data in support of faster adoption of an LDT by our CLIA-certified laboratory, SCMM. Lastly, Sequenom is sponsoring the RNA Noninvasive Aneuploidies ("RNA") study, a landmark, multi-center, prospective study involving up to 10,000 samples from first and second trimester pregnancies using the SEQureDx technology, managed and analyzed by an independent third-party."

47.    On February 3, 2009, Sequenom issued a press release entitled "Sequenom Announces Findings on Methylation Markers and RNA-SNP Markers as Presented at SMFM – Company Provides Additional Details on SEQureDx Trisomy 21 Technology Performance Data," which stated in part:

Sequenom, Inc. today announced new data showing the discovery of DNA methylation markers for Trisomy 21 (Down syndrome), Trisomy 18 (Edwards syndrome) and Trisomy 13 (Patau syndrome) and identification of chromosome RNA-SNP markers for early detection of Trisomies 18 and 13. The data were presented on Thursday and Friday, January 29 and January 30, 2009, at the 29th annual meeting of the Society for Maternal-Fetal Medicine (SMFM). In addition, Sequenom announced more information regarding the performance of its Down syndrome test at a separate meeting held concurrently in San Diego.

"Sequenom is committed to reinforcing its leadership in the noninvasive prenatal arena with innovative, proprietary technologies for chromosomal disorders, and monogenic, polygenic diseases using discrete and whole genome approaches," said Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "Our discoveries regarding new DNA methylation and RNA-SNP markers for Trisomies 21, 18, 13 will help expand our future assay offerings. Also, our new, proprietary DNA-based testing method, which was presented at our analyst meeting, complements our RNA-based strategy, especially as a reflex for homozygote no calls. The DNA-based method has the potential to work universally for T21, T18, T13 and gender determination in a single tube."

In an oral session presented at the SMFM meeting, Mathias Ehrich, M.D., Scientific Group Leader of Sequenom, highlighted the discovery of DNA methylation markers for prenatal aneuploidy testing in a presentation entitled "Discovery of DNA Methylation Markers for Prenatal Aneuploidy." The genome-wide methylation analysis identified more than 3,000 differentially methylated regions with approximately 90% confirmation; study results showed proof-of-concept for the sensitive detection of aneuploidies.

In a poster session at the SMFM meeting entitled "Identification of RNA-SNP Markers for Noninvasive Prenatal Diagnosis (NIPD) of T18 and T13," an exon array was utilized to compare gene expression profiles and identify SNPs using

- 21 -

matched placenta and maternal PBMC RNA samples. All SNP candidates were then screened using 100 human diversity genomic DNA samples of various ethnicities to measure the heterozygote rate (HR) for each SNP. SNPs with an HR of 4 percent or greater were retested using placental RNA samples. Four SNPs from one C13 gene and three C18 genes were selected for assay development based on positive placental RNA results and additional SNPs within these genes will be validated to expand population coverage for T13 and T18 screening using the RNA-based method.

The RNA, DNA and methylation marker variations of the SEQureDx™ Technology are being developed in parallel and may be validated in the same studies. All may ultimately be commercialized and prove complementary in some or all patients.

**Additional Data from Screening Studies Evaluating RNA-based SEQureDx Trisomy 21 Technology**

During an analyst and investor briefing held concurrently with the SMFM meeting, Sequenom presented new data evaluating its prenatal screening technology for Down syndrome. The data presented consisted of 459 new samples from prospective, blinded studies performed at Sequenom, bringing the total number of samples studied to 858. The test correctly identified all 22 T21 positive samples from the 459 new samples including eight first-trimester and 14 second-trimester Down syndrome samples (*i.e.* 100% sensitivity or detection rate) with one false positive and no false negatives, as confirmed by chorionic villus sampling (CVS) and amniocentesis. The DNA-based method correctly detected the one homozygous sample that the RNA-based method did not resolve (i.e., that had been deemed a "no-call").

A summary of the results for the 459 new samples including samples as early as 8 weeks of pregnancy are as follows:

- Specificity of 99.7% (98.4% - 100%) and 100% sensitivity (85.1 – 100%) at a 95 % confidence interval;

- The Positive Predictive Value is 95.6% (79.0% -99.8%) and the Negative Predictive Value of 100.0% (98.9% - 100%) at a 95% confidence interval;

- The SEQureDx RNA test had a total of 85 unresolved results ("no-calls") due to homozygotes (80) and unacceptably low RNA levels (5) for a total of 18.5%. The DNA-based method analyzed 68 of the homozygote "no-calls" and all were successfully resolved;

- The distribution of the 459 samples actually collected as compared to the expected rate in the U.S. population was Caucasian (282 vs. 307), Asian (101 vs. 20), African American (12 vs. 62) Hispanic (62 vs. 68) and Native American (2 vs. 3).

"We are pleased with the progress of our research efforts and look forward to transferring the technology to our CLIA facility soon for commercial launch in June," said Dr. Betty Dragon, Senior Vice President Research & Development. "We are confident that our no call rate for homozygote samples will improve as the patient population increases and the ethnic distribution normalizes. We expect that in the final test, ethnic coverage will be better than 95% of the U.S. population. Identification of additional SNPs by ongoing sequencing of the relevant genes of

1   homozygote patients, coupled with modest improvements in marker recovery, will
    further expand the ethnic coverage of the RNA-based test.

2

3       "Furthermore, when compared to amniocentesis or CVS, the new DNA-based
    method correctly identified all 68 homozygotes tested including a no-call T21 sample
    and a no call T18 sample. The DNA-based test shows great promise as a reflex to

4   the RNA method or potentially as a front-line test in its own right," added Dr.
    Dragon.

5

6       Based on the results from the 858 total study samples, the Sequenom
    SEQureDx RNA-based technology demonstrated:

7   •   Specificity of 99.9% (99.2% - 100.0%) and 100% sensitivity (87.9% -
        100.0%) at a 95% confidence interval;

8

9   •   The Positive Predictive Value is 96.6% (82.8% -99.8%) and the Negative
        Predictive Value of 100.0% (99.5% - 100%) at a 95% confidence interval;

10  •   The SEQureDx RNA test had a total of 106 unresolved results ("no calls")
        due to homozygotes (94) and unacceptable RNA levels (12) or a total of

11      12.4%. The DNA-based method, when applied, resolved all no calls;

12  •   SEQureDx is considerably more accurate than commonly employed
        standard-of-care screening tests, which perform at a 70%-90% detection rate

13      (i.e., sensitivity) with a 90%-95% specificity in practice. SEQureDx even
        compares favorably to current invasive procedures, such as amniocentesis

14      (which has sensitivity and specificity of approximately 99.5%).

15  48.     On February 11, 2009, Sequenom issued its fourth quarter and year-end 2008

16  financial results, in a release which stated in part:

17      Sequenom, Inc. today reported financial results for the three and 12 months ended
        December 31, 2008.

18

19      "This past year was pivotal for Sequenom as we continued to advance our
        genetic analysis and molecular diagnostics businesses," stated Harry Stylli, Ph.D.,
        President and Chief Executive Officer of Sequenom. "We accomplished many key

20      milestones over the last 12 months and are well-positioned for the launch of our
        SEQureDx™ Down syndrome technology in June. The data reported from our R&D

21      study containing 858-patient samples clearly shows that our SEQureDx screening
        technology is considerably more accurate than the current standard-of-care screening

22      technology, and even compares favorably against current invasive procedures. We
        intend to review in extensive detail the specifics of our promising study results and
        commercialization milestones by dedicating substantial time to these during our

23      quarterly investment-community conference call later today."

24                              *       *       *

25      **Early 2009 Highlights**

26  •   *Announced Additional Positive Results from RNA Down Syndrome Screening

27      Study and Unveiled Breakthrough DNA Approach to Prenatal Diagnostics*:
        Earlier this year, Sequenom announced positive data regarding the

28      performance of its Down syndrome test, including data from 459 new, high-

prevalence patient samples, bringing the total number of patient samples studied to 858. Based on the results from total study samples, including samples obtained as early as eight weeks of pregnancy, Sequenom's SEQureDx RNA-based technology demonstrated a 96.6% positive predictive value (PPV) and a 100% negative predictive value (NPV). Sequenom also unveiled a breakthrough DNA-based SEQureDx technology demonstrating, in early studies, universal ethnic coverage, high sensitivity and specificity, and the ability to detect Trisomy 21 (Down syndrome), Trisomy 18 (Edwards syndrome) and Trisomy 13 (Patau syndrome) in a single test.

\*       \*       \*

**Fourth Quarter 2008 Highlights**

- *New Data Indicates Next-generation Noninvasive Technology Accurately Quantifies Maternal Plasma DNA Sequences for Down syndrome*: In December Sequenom announced new data from a collaborative project with The Chinese University of Hong Kong, published in the Early Edition of the *Proceedings of the National Academy of Sciences*, that demonstrate Sequenom's innovative, next-generation, noninvasive prenatal diagnostic technology accurately quantified maternal plasma DNA sequences for Down syndrome, based on samples taken from women in the first and second trimesters of pregnancy. These data are the first to suggest that this future approach, based on massively parallel genomic DNA sequencing, can be effective in women who had not previously undergone invasive procedures.

49.    On March 12, 2009, Sequenom filed its annual report on Form 10-K for the year ended December 31, 2008, which was signed by defendants Stylli, Hawran, Cantor, Hixson, Afting, Fazio, Lerner, Lindsay and Wiltsey and represented that:

Based on the results from the 858 total study samples, our SEQureDx RNA-based technology demonstrated:

- Specificity of 99.9% (99.2%-100.0%) and 100% sensitivity (87.9%-100.0%) at a 95% confidence interval;

- The Positive Predictive Value is 96.6% (82.8%-99.8%) and the Negative Predictive Value of 100.0% (99.5%-100%) at a 95% confidence interval;

- The SEQureDx RNA test had a total of 106 unresolved results ("inconclusives") due to homozygotes (94) and unacceptable RNA levels (12) or a total of 12.4%. (The DNA-based method, when applied, resolved the no calls of those samples which could be tested);

- SEQureDx is more accurate than commonly employed standard-of-care screening tests, which perform at a 70%-90% detection rate (i.e., sensitivity) with a 90%-95% specificity in practice. SEQureDx even compares favorably to current invasive procedures, such as amniocentesis (which has sensitivity and specificity of approximately 99.5%).

- 24 -

"Specificity" is the probability that the test will be negative if the patient does not have the disease or condition. "Sensitivity" is the probability that the test will be positive if the patient has the disease or condition. "Positive Predictive Value" is the probability that a patient has the disease or condition when his/her test is positive. "Negative Predictive Value" is the probability that a patient does not have the disease or condition when his/her test is negative. The ranges in parentheses are 95% confidence intervals which represent the statistical uncertainty associated with the results based on the sample data.

*       *       *

In the near term, we are targeting a $2 billion prenatal screening opportunity with our prenatal Down syndrome and Rhesus D genotyping products. Cystic fibrosis carrier screening, which is often ordered when Down syndrome screening is performed is estimated to be a market worth an additional $250 to $750 million based on the different product offerings available in the United States today.

50.    The Form 10-K also included certifications by Stylii and Hawran, which certifications stated in part:

1.  I have reviewed this annual report on Form 10-K for the year ended December 31, 2008 of Sequenom, Inc.;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

*       *       *

4.  The registrant's other certifying officer(s) and I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared . . . .

51.    On April 29, 2009, after the market closed, the Company issued a press release entitled "SEQUENOM Announces Delay in Launch of SEQureDx Trisomy 21 Test." The press release stated in part:

SEQUENOM, Inc. announced today that the expected launch of its SEQureDx™ Down syndrome test is delayed, due to the discovery by company officials of employee mishandling of R&D test data and results. Accordingly the company is no longer relying on the previously announced R&D test data and results. SEQUENOM has not changed its plans to develop in parallel its RNA- and DNA-based methods

for the Down syndrome test and will endeavor to have a validated test in the fourth quarter of 2009. Under the circumstances, and as supported by key clinical opinion leaders, the company now intends to launch the Down syndrome test upon publication in a peer-reviewed journal of the results from the on-going large, independent clinical studies, which are designed to be practice-changing for Down syndrome testing.

The company's board of directors has formed a special committee of independent directors to oversee an independent investigation of the employees' activity related to the test data and results. The committee has engaged independent counsel to assist the committee in the conduct of the investigation.

\*     \*     \*

Today's announcement regarding the company's SEQureDx Down syndrome R&D test data and results supersedes all previous announcements about such data and test, including its press releases dated June 4, 2008, September 23, 2008, December 1, 2008, January 28, 2009 and February 3, 2009.

52. Also on April 29, 2009, Sequenom hosted an investor conference call to discuss the delay of the SEQureDx launch date, among other things. During the call, defendant Stylli gave the following vague description of the circumstances leading up to the delay:

As a result of internal inquiries, we have determined that the R&D study data associated with the Down's Syndrome assay was mishandled by individuals in our Company. This raises significant concerns regarding the integrity of that data. I am enormously disappointed to discover this could happen here and I'm even more disappointed that it would delay such a promising technology that is based on what we still believe to be solid and truly breakthrough science.

To say we're taking this situation seriously would be a massive understatement. The Board and I have taken several steps at this point. We have suspended four individuals and have put a new team in place to oversee the R&D studies for our prenatal diagnostics. The Board has convened a special committee of independent directors to oversee an investigation.

53. During the call, defendants refused to discuss any specifics of the "employee mishandling" that led to the delay, in the interest of "confidentiality." Naturally, defendants' refusal to provide color with respect to the mishandling led analysts and investors to assume the worst – that the employee mishandling of the study results was the result of fraud.

54. For example, during the call, Tony Butler, an analyst with Barclays Capital, asked defendant Stylli to provide further detail with respect with the "internal inquiries" that led to the discovery of the "four individuals" who mishandled the data. But defendant Stylli refused to provide any further detail stating: "Because of confidentiality considerations and because the investigation is not complete, I am limited as to what I can say."

- 26 -

55.   Charles Duncan, an analyst with JMP Securities, asked defendant Stylli when Sequenom management first became concerned about the validation of the SEQureDx test and whether that concern was related to the January mis-reporting of the no-call rate with respect to the 459 sample study.  Defendant Stylli, however, steadfastly refused to give any details stating: "I can't really go into any of the details because of the confidentiality considerations of the investigation is not complete."

56.   Another analyst, Jerry Kalmatos, asked Stylli whether "'falsified' is too strong a word" with respect to the "four individual's" "employee mishandling" of the data.  Again, defendant Stylli replied: "I would like to answer those questions, but again, I've got to respect the other [Board] committee until it concludes its analysis."

57.   Analysts and investors did not take kindly to the Individual Defendants' refusal to provide further details with respect to the "employee mishandling."  In an April 30, 2009 analyst report, analyst Zarak Khurshid with Caris commented that Sequenom "hosted a conference call yesterday where management provided almost no color with respect to the timing of the discovery, the personnel involved, and nature of the data mishandling.  We believe these events will set the Company back at least one year while *the technology and management's credibility is called into question*."  In another April 30, 2009 analyst report, analyst Amit Hazan with Oppenheimer, downgraded Sequenom from "Perform" to "Underperform" based upon "the importance of the Downs Syndrome test to the company's valuation and *the unknown impact* to the company from the investigation."

58.   On this news, Sequenom's stock collapsed more than $11 per share to as low as $3.23 per share, a one-day decline of over 75%, on volume of more than 85 million shares.

59.   On June 30, 2009, the Company filed a Form 8-K with the SEC, stating:

On June 29, 2009, we received written notification that the Securities and Exchange Commission (the "*SEC*") has initiated an investigation relating to our April 29, 2009 announcement regarding our SEQureD Down Syndrome test.

60.   The true facts, which were known by the defendants but concealed from the investing public during the Relevant Period, were as follows:

1      (a)      Company employees mishandled test data and results concerning Sequenom's

2  Down syndrome test; and

3      (b)      The Company failed to maintain internal controls sufficient to prevent the

4  mishandling of test data and results.

5      61.      Defendants' false statements have ruined their once valuable franchise.  In fact, the

6  April 29, 2009 disclosure wiped out over $600 million in shareholder equity.

7  **DERIVATIVE ALLEGATIONS AND DEMAND FUTILITY ALLEGATIONS**

8      62.      Plaintiff incorporates by reference and realleges each and every allegation set forth

9  herein.

10      63.      Plaintiff brings this action derivatively on behalf of Sequenom to redress injuries

11  suffered, and to be suffered, by Sequenom as a direct result of the breaches of fiduciary duty, abuse

12  of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the

13  aiding and abetting thereof, by the Individual Defendants.  Sequenom is named as a nominal

14  defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this

15  Court that it would not otherwise have.

16      64.      Plaintiff will adequately and fairly represent the interests of Sequenom in enforcing

17  and prosecuting its rights.

18      65.      As of the date this Complaint was filed, the Sequenom Board consisted of eight

19  directors:  defendants Afting, Fazio, Hixson, Lerner, Lindsay, Wiltsey, Cantor and Stylli (the

20  "Director Defendants").

21      66.      Plaintiff has not made a demand on the present Board of Sequenom to institute this

22  action because such a demand would have been a futile, wasteful and useless act, particularly for the

23  following reasons:

24      (a)      Any suit by the current directors of Sequenom to remedy the wrongs

25  complained of herein would expose the Individual Defendants themselves and their friends and

26  business allies to significant personal liability for their breaches of fiduciary duties and other

27  misconduct. The Director Defendants have demonstrated their unwillingness and/or inability to act

28  in compliance with their fiduciary obligations an/or to sue themselves and/or their fellow directors

1  for the wrongful conduct described herein.  Each of the Director Defendants are accused of

2  wrongdoing and recommending, approving and signing the registration statement, and thus, face a

3  substantial likelihood of liability thereby rendering any demand upon them futile.

4              (b)     The Compensation Committee of the Board is responsible for approval of

5  executive officers' compensation, including defendants Stylli and Cantor.  In 2008, Stylli and Cantor

6  received $3.9 million and $623,039, respectively, in total compensation from Sequenom.  The

7  Compensation Committee is comprised of defendants Hixon, Lerner and Lindsay.  As the members

8  of the Compensation Committee singularly control approval of Stylli's and Cantor's compensation,

9  they will not institute this action against defendants Hixon, Lerner and Lindsay.  To do so would

10  jeopardize their personal financial compensation.  Thus, demand on Stylli and Cantor is futile.

11             (c)     According to the Company's most recent proxy statement: "The Nominating

12  and Corporate Governance Committee oversees non-employee director compensation . . . ." At the

13  time this action was initiated the Nominating and Corporate Governance Committee consisted of

14  defendants Afting, Hixon and Lerner.  Thus, because defendants Afting, Hixon and Lerner approve

15  the cash compensation of each non-employee Director Defendant, the non-employee Director

16  Defendants would not institute this action against the other Director Defendants as it would

17  jeopardize their personal compensation.  Thus, demand on each of the Director Defendants is futile.

18        67.     The Director Defendants were aware of and participated in and approved of the

19  wrongs alleged herein.  Thus, the Director Defendants have knowingly chosen not to exercise the

20  fiduciary duties of loyalty and due care owed to the Company, and to protect Sequenom or to rectify

21  the illegal practices complained of herein.  The Director Defendants therefore have approved of and

22  continue to participate in a course of corporate misconduct that includes the following:

23             (a)     The Director Defendants were involved in approving and/or condoning the

24  illegal conduct and practices described herein.  Each Director Defendant had the ability and/or

25  opportunity to prevent these practices.  The Board is responsible for overseeing the Company's

26  compliance with legal requirements and, therefore, all directors are liable for not ensuring that the

27  officers and employees of the Company did not expose the Company to unnecessary risk.  Because

28

1 the Director Defendants are liable for approving and directing the illegal conduct described herein,

2 demand would be futile.

3          (b)    Defendants' illegal conduct is not subject to business judgment protection or

4 subject to ratification.

5    68.    The wrongful conduct complained of herein by the Director Defendants amounted to

6 breaches of their fiduciary duties of good faith, due care, and loyalty to Sequenom and its

7 shareholders.

8    69.    The Director Defendants refused to put into place adequate internal controls and

9 adequate means of supervision to stop the wrongful conduct alleged herein despite the fact that the

10 Board knew and/or recklessly ignored such wrongful business practices.  These acts, and the acts

11 alleged in this action, demonstrate a pattern of gross misconduct, which conduct is not taken

12 honestly and in good faith.

13    70.    Moreover, despite the Individual Defendants having knowledge of the claims and

14 causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for

15 Sequenom for any of the wrongdoing alleged by plaintiff herein.

16                              **COUNT I**

17              **Breach of Fiduciary Duty**
                 **Against the Individual Defendants**
18

19    71.    Plaintiff repeats and realleges each and every allegation contained above.

20    72.    The Individual Defendants owed and owe Sequenom fiduciary obligations.  By

reason of their fiduciary relationships, the Individual Defendants owed and owe Sequenom the
21

highest obligation of good faith, fair dealing and loyalty in the management of the Company.
22

23    73.    The Individual Defendants each violated and breached their fiduciary duties of good

faith and loyalty.  They have each also been responsible for the gross and reckless management of
24

Sequenom and ignored their fiduciary responsibilities by causing the Company to engage in the
25

unlawful conduct described herein.
26

27    74.    The Individual Defendants engaged in the above conduct in intentional breach of their

fiduciary duties to the Company.
28

- 30 -

75. The Individual Defendants conspired to abuse, and did abuse, their positions of control and oversight at Sequenom.

76. As a direct and proximate result of the Individual Defendants' failures to perform their fiduciary obligations, Sequenom has sustained significant damages. Plaintiff, as a shareholder and representative of the Company, seeks damages and other relief for the Company.

## COUNT II

### Abuse of Control
### Against the Individual Defendants

77. Plaintiff repeats and realleges each and every allegation contained above.

78. The Individual Defendants' misconduct alleged herein constitutes a breach of their fiduciary duties because they abused their ability to control and influence Sequenom, for which they are legally responsible.

79. As a direct and proximate result of the Individual Defendants' abuse of control, Sequenom has sustained significant damages.

80. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT III

### Gross Mismanagement
### Against the Individual Defendants

81. Plaintiff repeats and realleges each and every allegation contained above.

82. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Sequenom in a manner consistent with the operations of a publicly held corporation.

83. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sequenom has sustained significant damages.

84. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT IV

### Waste of Corporate Assets
### Against the Individual Defendants

85.   Plaintiff repeats and realleges each and every allegation contained above.

86.   As a result of the improper conduct described herein, and by failing to properly consider the interests of the Company and its public shareholders and by refusing to conduct proper supervision, the Individual Defendants have caused Sequenom to waste valuable corporate assets and incur substantial costs to defend the Individual Defendants' unlawful actions.

87.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT V

### Unjust Enrichment
### Against the Individual Defendants

88.   Plaintiff repeats and realleges each and every allegation contained above.

89.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Sequenom.

90.   Plaintiff, as a shareholder and representative of Sequenom, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT VI

### Breach of Fiduciary Duties for Insider Selling
### and Misappropriation of Information
### Against Defendant Owings

91.   Plaintiff repeats and realleges each and every allegation contained above.

92.   At the time of the stock sales set forth herein, defendant Owings knew the information described above, and sold Sequenom common stock on the basis of such information.

93.   The information described above was proprietary non-public information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which defendant Owings used for his own benefit when he sold Sequenom common stock.

94.     At the time of his stock sales, defendant Owings knew that the Company's business prospects were materially overstated. Defendant Owings' sales of Sequenom common stock while in possession and control of this material adverse non-public information was a breach of his fiduciary duties of loyalty and good faith.

95.     Since the use of the Company's proprietary information for his own gain constitutes a breach of defendant Owings' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that defendant Owings obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Against defendants and in favor of the Company for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and aiding and abetting breaches of fiduciary duties;

B.      Determining and awarding Sequenom treble damages pursuant to California Corporations Code §25502.5(a) for defendant Owings' violations of California Corporations Code §25402;

C.      Directing Sequenom to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Sequenom and its shareholders from a repeat of the damaging events described herein;

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding and imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Sequenom has an effective remedy;

E.      Awarding to Sequenom restitution from defendants, and each of them, including ordering disgorgement of all profits, benefits and other compensation obtained by defendants;

F.      Awarding plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

1

**JURY DEMAND**

2

     Plaintiff demands a trial by jury.

3  DATED: September 3, 2009

           COUGHLIN STOIA GELLER
4                RUDMAN & ROBBINS LLP
           TRAVIS E. DOWNS III
5            BENNY C. GOODMAN III

6

7                   TRAVIS E. DOWNS III

8            655 West Broadway, Suite 1900
           San Diego, CA 92101-3301
9            Telephone: 619/231-1058
           619/231-7423 (fax)
10

11            Attorneys for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  S:\CptDraft\Derivative\Cpt Sequenom_Derv.doc

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**VERIFICATION**

I, DARREL HERMANS, hereby declare as follows:

I am a shareholder of Sequenom, Inc. I was a shareholder at the time of the wrongdoing complained of and I remain a shareholder. I have retained competent counsel and I am ready, willing and able to pursue this action vigorously on behalf of Sequenom, Inc. I have reviewed the Verified Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _9/3/09_

_Darrel Hermans_
DARREL HERMANS

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| DARREL HERMANS, Derivatively on Behalf of SEQUENOM, INC. | ERNST-GUNTER AFTING, JOHN A. FAZIO, 2:24 (SEE ATTACHMENT A) |

**(b)** County of Residence of First Listed Plaintiff **Wisconsin**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

DEPUTY

'09 CV 1927 LAB    CAB

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Travis E. Downs III, Coughlin Stoia Geller Rudman & Robbins LLP
655 W. Broadway, Ste. 1900, San Diego, CA 92101 619/231-1058

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☒ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §1332(a)(2)
Brief description of cause:
Verified Shareholder Derivative Complaint

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $    CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE    DOCKET NUMBER

DATE    SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 4838    AMOUNT 350    APPLYING IFP    JUDGE    MAG. JUDGE

9/3/09

ATTACHMENT A

HARRY F. HIXSON, JR., RICHARD A. LERNER, RONALD M. LINDSAY, KATHLEEN M. WILTSEY, HARRY STYLLI, PAUL W. HAWRAN, ALLAN T. BOMBARD, CHARLES R. CANTOR, ELIZABETH DRAGON and STEVEN OWINGS,

Defendants,

– and –

SEQUENOM, INC., a Delaware corporation,

Nominal Defendant.

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS004838
Cashier ID: sramirez
Transaction Date: 09/03/2009
Payer Name: GELLER LLP
--------------------------------
CIVIL FILING FEE
 For: HERMANS V. ERNST-GUNTER
 Case/Party: D-CAS-3-09-CV-001927-001
 Amount:      $350.00
--------------------------------
CHECK
 Check/Money Order Num: 68358
 Amt Tendered:  $350.00
--------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.
```